# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **RAYMOND BERNERO,** **Plaintiff,** v. **THE VILLAGE OF RIVER GROVE,** a municipal corporation, and **LYNN BJORVIK,** in her official capacity, **Defendants.** | No. 17 CV 05297 Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

After a thirty-three year career working for the Village of River Grove, Plaintiff Raymond Bernero ("Bernero") was terminated in August 2016. He claims that his termination was in retaliation for disclosing public corruption and other wrongful conduct by the Village's lawyers and other employees. Bernero filed a two-count complaint against Defendants the Village of River Grove ("Village") and Lynn Bjorvik ("Bjorvik") (collectively, "Defendants"), alleging violations of his First Amendment rights and the Illinois Whistleblower Act. Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, Defendants' Motion to Dismiss is DENIED.

1

# I. BACKGROUND

In his Second Amended Complaint (Dkt. 28) ("SAC" or "Complaint")[1], Bernero alleges he was first employed by the Village as an on-call firefighter and EMT until 1997 when he became Trustee of the Village. In 2006, he became Economic Development Director, a position he held until August 31, 2016, when he was terminated. (SAC ¶¶ 7–9).

In 2003, Bernero was informed by a developer that Village Attorney Harry Smith ("H. Smith") was simultaneously representing the seller of a bar and the Village Zoning Board of Appeals, which was responsible for approving the purchase agreement for the bar. Bernero emailed the Village Board, H. Smith, and Bart Smith ("B. Smith", H. Smith's son and the Village's corporate counsel, collectively they are referred to as the "Village Attorneys") and requested that H. Smith disclose whether he was representing the seller. H. Smith did not respond but B. Smith later confronted Bernero and accused him of harassing his father. (SAC ¶¶ 18–21, hereafter "Bar Sale Conflict"[2]).

In 2009, Bernero noticed that Allstate Insurance agency became a tenant in H. Smith's commercial building without the necessary business license or permits. In July 2009, at a Zoning Board of Appeals hearing, Bernero publicly questioned H. Smith about how Allstate became a commercial tenant without the proper permits

---

[1] The Court accepts as true all of Plaintiff's well-pleaded factual allegations in the Complaint and draws all reasonable inferences in Plaintiff's favor in deciding the motion to dismiss. *See Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016).
[2] The Court refers to Bernero's speech with abbreviated terms for ease of reference.

and publically questioned the Smiths' conduct in ignoring the Village Code for monetary gain. (SAC ¶¶ 30–38, "Allstate Tenant Issue").

In February 2011, Bernero discovered that a contract between the Village and AT&T, which had been initiated in 2007, had not been finalized until 2011. (In 2007, Bernero worked on the AT&T deal and B. Smith was tasked with completing the contract). Bernero notified the Village President and other Trustees that the contract was not completed until 2011 and as a result the Village missed out on approximately $30,000 in revenue in 2010. (SAC ¶¶ 22–29, "AT&T Contract"). In 2013, Bernero disclosed to the Village Board that the Village Attorneys failed to apply for tax exempt status on certain land, costing the Village tens of thousands of dollars. (*Id.* at ¶¶ 63–69, "2013 Tax Issue").

In February 2015, Bernero was approached by a Special Agent of the Federal Bureau of Investigation ("FBI"). Bernero agreed to meet with the agent and answered questions about the Village. The agent asked him to identify individuals in photographs including two photographs of Village employees and to wear a recording device to help gather evidence. Bernero declined the request to wear a recording device. Bernero told Bjorvik about his meeting with the FBI (though not about the photographs) and Bjorvik, on information and belief, told the Village Attorneys about Bernero's meeting with the FBI. (*Id.* at ¶¶ 39–41).

In the Spring of 2015, Impact Auto Body ("Impact"), a mechanic repair shop, began parking damaged vehicles on public property in violation of Village ordinances. Bernero attended a meeting with then-Village President Marilynn May

("May") and Village Police Chief Rodger Loni ("Chief Loni"). May asked Chief Loni to explain why tickets were not being issued to Impact and Chief Loni responded that it was being taken care of, but Bernero later learned that Chief Loni instructed another officer to visit Impact but not to give any tickets. In May 2015, Bernero considered not renewing Impact's license and requested a meeting with Impact's owner, Mr. Kuzmicki. Village Detective Villagomez told Bernero that Mr. Kuzmicki was a "good guy" and Bernero should not cause any trouble for Mr. Kuzmicki. Villagomez asked Bernero to accompany him to meet with Mr. Kuzmicki at his body shop but Bernero insisted any meeting take place at Village Hall. When Bernero later met with Mr. Kuzmicki, Mr. Kuzmicki told Bernero that he had never received a ticket, the Village police must like him and he "takes care of the police." Mr. Kuzmicki offered Bernero a $500 restaurant gift card, which Bernero refused.

Bernero told May, then-Trustee Bjorvik and the Village Comptroller about Mr. Kuzmicki's offer. In response, May called Chief Loni and demanded that all illegally parked cars at Impact be removed immediately. Bernero learned from the manager of a self-storage facility that Detective Villagomez asked him to store the cars at his facility; after refusing initially, the manager agreed because he felt intimidated. Bernero told May about these events. May called Chief Loni into her office with Bernero. When Bernero explained the events related to the self-storage, Chief Loni abruptly left. Bernero believed Chief Loni thought he was wearing a listening device for the FBI. Bernero disclosed the events related to Impact and Mr. Kuzmicki, the Village police department's failure to issue tickets to Impact, the storage of the

4

cars, and the conversation with Chief Loni to the FBI. (*Id.* at ¶¶ 42–61, "Impact Auto Events").

In Spring 2016, Bernero learned that H. Smith applied for tax exempt status on land that he said was used for municipal purposes but was actually used for commercial purposes. The lease H. Smith drafted was grossly under fair market value for the land and required the tenants to pay property taxes. Bernero disclosed the existence of the lease and improper tax exemption publicly. (*Id.* at ¶¶ 74–78, "Improper Tax Exemption").

In June 2016, at a Financial Strategy Group meeting, Bernero became aware of an Illinois Department of Insurance report about the Village's police pension fund. The report concluded that Chief Loni's pension violated a state statute, and pointed to an ordinance that B. Smith had authored as evidence of the violation. Bernero publicly addressed this issue. (*Id.* at ¶¶ 70–73, "Pension Violation").

In mid-June 2016, after May resigned as President for personal reasons, B. Smith advised the Village Board to elect Bjorvik. The Village Board elected her as acting President. Later that month, Bjorvik requested that Bernero submit a report of his projects, points of contact and other details, and told him that B. Smith had drafted the document seeking Bernero's report. Bernero provided the information and asked why he was the only Village employee required to submit a report. Bjorvik replied that she had lost a great deal of trust in him in recent weeks because of an email Bernero sent the Mayor of Rosemont which she believed

contained disparaging remarks about her and her husband. Bjorvik had not seen the email and declined Bernero's offer to read it. (*Id.* at ¶¶ 79–88).

At a Fourth of July celebration in 2016, Bernero discussed the Village Attorneys' misconduct with David Guerin. (Guerin was rumored to be interested in running for Village President at the next election, which he did and is now the President.) Guerin, who was friends with the Village Attorneys, defended them. On July 7, 2016, the Village Board presented its proposed 2016–17 budget which included the salary for Bernero's position as Economic Development Director. On July 16, 2016, Bernero spoke again to Guerin and apologized for discussing politics at a celebratory event. Guerin told Bernero that if the Village Attorneys truly wanted to get rid of him, they would simply remove his salary from the annual budget. (*Id.* at ¶¶ 89–93, "Guerin Discussions").

On July 20, 2016, Bjorvik told Bernero that his position might be eliminated due to budget concerns. Bernero responded that eliminating his position would have minimal effect on the Village's general fund. Nevertheless Bjorvik amended the budget, eliminating Bernero's position, the only position eliminated at that time, terminating Bernero's employment on August 31, 2016. (*Id.* at ¶¶ 15, 89–97).

Bernero filed his original complaint in this case on July 19, 2017 (Dkt. 1) and an amended complaint on July 24, 2017 to correct a minor typo (Dkt. 3). After Defendants filed their first motion to dismiss, Bernero sought leave, with Defendants' agreement, to file an amended complaint, which was granted. On November 2, 2017 Bernero filed his Second Amended Complaint. (Dkt. 28).

6

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint; the purpose is not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A Rule 12(b)(6) motion is considered in light of the liberal pleading standard of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (internal citations and alterations omitted). A determination of the sufficiency of a claim must be made "on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). All well-pleaded facts are assumed to be true, "and all such facts, as well as the reasonable inferences therefrom, are viewed in the light most favorable to the plaintiff." *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir. 1997).

## III. DISCUSSION

Defendants seek dismissal of both the First Amendment and Illinois Whistleblower Act claims. They argue that Bernero failed to state a claim for a violation of his First Amendment rights because (1) his alleged protected speech was too remote in time to be related to the alleged adverse employment action, and (2) his speech was made pursuant to his official duties and therefore not protected by the First Amendment. With regard to his Illinois Whistleblower Act ("IWA")

claim, Defendants contend that (1) there is no individual liability under the IWA so Bjorvik cannot be liable, and (2) Bernero failed to allege what part of the IWA was violated.

**A. Violation of the First Amendment (Count I)**

To make a prima facie First Amendment retaliation case, a plaintiff must show that: "(1) the employee's speech was constitutionally protected; (2) the employee has suffered a deprivation likely to deter free speech; and (3) the employee's speech was a motivating factor in the employer's decision." *Redd v. Nolan*, 663 F.3d 287, 294 (7th Cir. 2011). Defendants argue that Bernero has not sufficiently pled the first and third elements. With regard to the first, "[t]o show that his speech is protected under the First Amendment, [plaintiff] must demonstrate that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Davis v. City of Chi.*, No. 16-1430, 2018 U.S. App. LEXIS 11985, at *4 (7th Cir. May 8, 2018) (internal citations and quotations omitted). Defendants focus on the first part of the test—they say that Bernero spoke as a public employee pursuant to his official duties, not as a private citizen.

Courts in this district have recognized that establishing a First Amendment prima facie case "is an evidentiary requirement and not a pleading standard," but have found that the requirement helps to guide a court's decision about whether the retaliation claim can survive a Rule 12(b)(6) motion to dismiss. *Schmidt v. Vill. of*

8

*Glenwood,* No. 14 C 9112, 2015 U.S. Dist. LEXIS 81776, at *9 (N.D. Ill. June 24, 2015); *see also Sroga v. Preckwinkle*, No. 14 C 06594, 2017 U.S. Dist. LEXIS 9407, at *8 (N.D. Ill. Jan. 24, 2017).

### *1. Speech as Private Citizen*

The Court begins with Defendants' contention that Bernero's speech was not constitutionally protected because he spoke as a public employee. In certain circumstances, a public employee's speech is protected by the First Amendment when he or she speaks as a citizen on matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, in *Garcetti,* the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. To determine the official duties of a public employee, courts practically assess the duties an employee is expected to perform. *Id.* at 424–25.

A plaintiff "must provide a plausible basis for speaking as a citizen and not an employee." *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539–40 (7th Cir. 2016). At the pleadings stage, some courts have concluded from the allegations that the plaintiff spoke pursuant to his or her official duties, while others have found the allegations sufficient to show that plaintiff's speech was made as a private citizen. *Compare, e.g. id.* at 539–40 (university professor's allegations indicated that she spoke "pursuant to her faculty role, and she failed to make any factual allegations indicating otherwise."); *Vose v. Kliment,* 506 F.3d 565, 569 (7th Cir. 2007) (most of

9

police officer's speech made pursuant to direct orders of supervisors) *to Spalding v. City of Chi.*, 24 F. Supp. 3d 765, 777 (N.D. Ill. 2014) (denying motion to dismiss and finding that police officers' reporting alleged misconduct to the FBI was speech as a private citizen).

Here, some of Bernero's speech appears to have been pursuant to his official duties. For example, with regard to the AT&T Contract, Bernero says that he initially worked on the deal in 2007.[3] (SAC ¶ 22). In 2011, when he was Economic Development Director, Bernero discovered that the contract had not been finalized and told then-President May, May asked him to "lead an effort to finalize the agreement with AT&T," which he did. (*Id.* at ¶¶ 27–28). Bernero then communicated the alleged misconduct of the Village Attorneys in not finalizing the contract and potentially costing the Village revenue to the Village President and Trustees only. (*Id.* at ¶¶ 29). These allegations show that Bernero was reporting on conduct "related to [his] job", through the "usual channels of his employment." *Roake v. Forest Pres. Dist.*, No. 15 C 8949, 2016 U.S. Dist. LEXIS 83365, at *5–6 (N.D. Ill. June 28, 2016). There is no allegation indicating that Bernero was speaking as a private citizen when he discussed the AT&T Contract.

However, other allegations in Bernero's Complaint provide a plausible basis that he spoke as a private citizen. He alleges that he publicly addressed the Allstate Tenant Issue, Improper Tax Exemption and Pension Violation, discussed the Village Attorneys' misconduct with a private citizen, told the FBI about the Impact

---

[3] The Complaint states that Bernero was Village Trustee in 2007 but that seems to contradict other allegations in his Complaint that he became Economic Development Director in 2006.

10

Auto Events, and otherwise spoke to the FBI about issues concerning the Village. The allegations provide a plausible basis to infer that Bernero was speaking outside of his official duties. *See* S*palding*, 24 F. Supp. 3d at 777 (denying motion to dismiss and finding that police officers' report to the FBI was speech as a private citizen). Further, the Seventh Circuit has cautioned that when the speech concerns charges of public corruption, "we must be especially careful in concluding that employees have spoken pursuant to their official duties." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 793–94 (7th Cir. 2016) (on summary judgment, finding that plaintiff spoke as a citizen to two fellow police officers and the FBI).

### *2. Motivating Factor*

Defendants also argue that Bernero failed to sufficiently plead that his speech was a motivating factor in the decision to terminate him. They contend that he relies solely on suspicious timing and the time between his alleged protected speech and termination is too remote. Bernero responds that the time period is not too remote, and in any case, more than suspicious timing supports his claim.

A plaintiff who relies on circumstantial evidence to show that his protected speech was at least a motivating factor in the adverse employment action may point to "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965–66 (7th Cir. 2012) (internal citations and quotations omitted). For a court to infer causation from suspicious timing alone, the adverse employment action must "follow[] close on the heels of protected expression" and the

person who decided to impose the adverse action must know of the protected speech. *Id.* at 966 (internal citations and quotations omitted). There is "no set legal rule" defining what constitutes "close on the heels" because such a determination "depends on context." *Id.* Nevertheless, the Seventh Circuit typically has allowed "no more than a few days to elapse between the protected activity and the adverse action" and in *Kidwell,* concluded that time gaps of five weeks and two months were too long. *Id.*

Although *Kidwell* was decided on summary judgment, courts have looked to that case for guidance at the pleading stage. *See Wheeler v. Piazza*, No. 16-cv-3861, 2018 U.S. Dist. LEXIS 23182, at *14, 17 (N.D. Ill. Feb. 13, 2018) (nine month gap too remote and no other allegations in complaint plausibly supported retaliation claim). As the Seventh Circuit stated in *Carlson v. CSX Transp., Inc.*, "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible." 758 F.3d 819, 828 (7th Cir. 2014).

Bernero's allegations plausibly support his claim that his speech was a motivating factor in his termination. The shortest time period between his speech and termination was approximately two months, between his public disclosure of the Pension Violation in June 2016 and his August 2016 termination. The time from his Improper Tax Exemption disclosure to termination was a few months.[4] While this is more than a few days, it is also not the case that the allegations are so "bare-

---

[4] Bernero does not specify a date in June 2016 or Spring 2016 for his disclosures so the Court reasonably infers in his favor that there time gaps were two months and a few months, respectively.

12

bones that a lengthy time period between the protected activity and the alleged retaliation" makes "any causal connection…implausible." *Carlson,* 758 F.3d at 828.

The Complaint contains allegations to support causation, in addition to suspicious timing. Bernero was given conflicting reasons for his termination—Bjorvik told him that she lost trust in him due to an email she believed was disparaging about her and her husband, and then approximately one month later, told him that his position was being eliminated because of budget concerns. Guerin, who was friends with the Village Attorneys, told Bernero that if the Village Attorneys wanted to get rid of him, they would remove his salary from the budget. Just a few days later, Bjorvik told Bernero that his position might be eliminated because of budget concerns. Only Bernero's position was eliminated. These allegations, in addition to the two-month period between his most recent speech and termination, allow the Court to plausibly infer causation. Keeping in mind that establishing a First Amendment prima facie case is an evidentiary requirement and that there is "no requirement that a plaintiff specifically plead suspicious timing" (*McCarragher v. Ditton*, No. 14 C 08591, 2017 U.S. Dist. LEXIS 76873, at *23 (N.D. Ill. May 19, 2017)), the Court concludes that Bernero's allegations are sufficient at this stage.

**B. Violation of Illinois Whistleblower Act (Count II)**

In his claim brought under the Illinois Whistleblower Act, Bernero alleges that Defendants were prohibited from "retaliating against the Plaintiff for his disclosure of improper and unlawful inaction by the Village," and Defendants intentionally

retaliated against him because of his "disclosing public corruption and wrongdoing on the part of the Village's agents and employees." (SAC ¶¶ 133–34). Defendants moved to dismiss on the grounds that (1) there is no individual liability under the IWA so Bjorvik cannot be liable, and (2) Bernero failed to allege what part of the Act was violated.

Bernero alleges that at the time that Bjorvik fired him, Bjorvik was the acting Village President and "was acting within the scope of her authority in dealing with the Village's employees." (SAC ¶¶81, 96, 131). The plain language of the IWA and the weight of authority in this district demonstrate why Defendants' argument that Bjorvik should be dismissed fails. Under the IWA an "employer" may be "any [] entity that has one or more employees in this State," and "*any person acting within the scope of his or her authority* express or implied on behalf of those entities in dealing with its employees." 740 ILCS 174/5 (emphasis added). *See also Van Pelt v. Bona-Dent, Inc.*, No. 17 C 1128, 2018 U.S. Dist. LEXIS 82288, at *15 (N.D. Ill. May 16, 2018) ("The unambiguous and plain language of the IWA includes Bonafiglia because he is alleged to have been acting on behalf of the BonaDent corporation and within the scope of his authority when he fired Van Pelt."); *Hower v. Cook Cty. Sheriff's Office*, No. 15 C 6404, 2016 U.S. Dist. LEXIS 18322, at *9 (N.D. Ill. Feb. 16, 2016) (denying motion to dismiss Illinois Whistleblower Act claims because complaint alleged defendants acted within the scope of their authority when dealing with plaintiff as an employee); *Bello v. Vill. of Skokie*, No. 14 C 1718, 2014 U.S. Dist. LEXIS 121664, at *25 (N.D. Ill. Sep. 2, 2014) ("the IWA makes it clear that

individuals acting on behalf of an entity that one might colloquially understand to be a person's 'employer' may likewise be considered 'employers' potentially liable for violating the statute.").

The Court is also not convinced by Defendants' argument that Bernero failed to allege what part of the IWA was violated. The allegations in the Complaint give Defendants "fair notice of what the claim is and the grounds upon which it rests." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015) (internal citations omitted). In *Foster v. PHH Mortg.*, No. 15 C 7650, 2016 U.S. Dist. LEXIS 48026, at *3–4 (N.D. Ill. Apr. 8, 2016), the defendant argued for dismissal of the complaint because it alleged that defendant violated Dodd-Frank in general but did not cite to a specific section of the statute. Citing a "strong commitment to the idea that a plaintiff need not plead legal theories in her complaint" (*King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014)), the Court found that plaintiff's factual allegations plausibly stated a claim and gave defendant sufficient notice of the claims asserted, even without citing a specific section of Dodd-Frank. This Court applies the same logic here, to the IWA which is not as complex as the Dodd-Frank Act.

In their Reply Brief, Defendants additionally argue that Bernero did not report the suspected violation of state or federal laws to authorities as required by the IWA. (Dkt. 43 at 10). Under the IWA, "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a

violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). Bernero alleged that he "disclosed the events surrounding Impact, the Village police department's refusal to enforce the law, the meeting with Mr. Kuzmicki, the subsequent repositioning of the vehicles to Compass Self Storage through Village police officer's request, and the conversation with Chief Loni to the FBI." (SAC ¶ 61). He further claimed that he was retaliated against for "disclosing public corruption and wrongdoing on the part of the Village's agents and employees." (*Id*. ¶ 134). Thus Bernero's allegations are sufficient to give Defendants fair notice of his IWA claim and the grounds upon which it rests.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss [36] is DENIED. Status hearing set for July 10, 2018 at 9:30 AM to report on the status of discovery.

Dated: June 22, 2018         E N T E R:

_Mary M Rowland_
MARY M. ROWLAND
United States Magistrate Judge