IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RAYMOND BERNERO**, an individual, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) CASE NO.: 17-cv-05297 |
| | ) |
| **THE VILLAGE OF RIVER GROVE**,<br>a municipal corporation, and<br>**LYNN BJORVIK,** in her official capacity, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## THIRD AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, **RAYMOND BERNERO** ("Plaintiff"), by and through his attorneys, PARIKH LAW GROUP, LLC, and as his Third Amended Complaint at Law against the Defendants, **THE VILLAGE OF RIVER GROVE** (the "Village") and **LYNN BJORVIK** in her official capacity as the President of the Village ("Bjorvik", together referred to as the "Defendants"), he states as follows:

## INTRODUCTION

Plaintiff seeks redress for violations of his rights of free speech, as secured by the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983; and for retaliation in response to the disclosure of public corruption or wrongdoing in violation of the Illinois Whistleblower Act.

## DEMAND FOR JURY TRIAL

Plaintiff brings this action and demands a trial by jury on all counts.

## JURISDICTION AND VENUE

1. This court has jurisdiction over this matter with respect to Count I pursuant to the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. §1343, and the Constitution of the United States.

2. This court has supplemental jurisdiction over this matter with respect to Count II pursuant to U.S.C. § 1367 in that the state claim is so related to the Federal cause of action that it forms part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c) because all parties named herein reside in this district. Additionally, all events giving rise to Plaintiff's claims occurred within this district.

## PARTIES

4. The Plaintiff is now and was at all times complained of a resident of the Village of River Grove, in the County of Cook, in the State of Illinois. The Plaintiff was an employee working in various capacities for the Village of River Grove for approximately thirty-three (33) years, until he was improperly terminated.

5. Defendant Village is now and was at all times complained of a municipality incorporated under the laws of the State of Illinois, and is located in the County of Cook, in the State of Illinois.

6. Defendant Bjorvik was the Village President during the time relevant to the improper termination of the Plaintiff.

## FACTS

7. The Plaintiff became an employee of the Village beginning in approximately 1983 as an on-call firefighter and EMT. In approximately 1997, the Plaintiff accepted a position as a Trustee of the Village. The Plaintiff served as a Trustee of the Village from 1997 until approximately 2006, when the Plaintiff accepted the position of Economic Development Director with the Village.

8. As a Trustee of the Village from approximately 1997 through 2006, the Plaintiff chaired the Public Works Committee from approximately 1997 through 1999, and later chaired the Finance Committee from approximately 1999 through 2006.

9. The Plaintiff held the position of Economic Development Director from 2006 until approximately August 31, 2016, at which time he was illegally terminated.

10. Throughout his approximate thirty-three (33) year tenure as an employee of the Village, the Plaintiff frequently disclosed abuses of power, conflicts of interest, including dereliction of duty, malfeasance, and potentially illegal activity on the part of attorneys employed by the Village, namely Bart Smith ("B. Smith") and/or Harry Smith ("H. Smith").

11. B. Smith was employed by the Village as its corporate counsel at all relevant times to this Complaint, and remains so employed.

12. H. Smith was employed by the Village as the Village Attorney at all relevant times to this Complaint, and remains so employed.

13. H. Smith is B. Smith's father, and together the two own and operate a law practice in the Village.

14. B. Smith and H. Smith are paid by the Village on a salary basis for purported services rendered to the Village, and they are included on the Village's payroll.

15. As a direct result of the Plaintiff's persistence in vocalizing misconduct on the parts of both B. Smith and H. Smith occurring within the Village during the Plaintiff's tenure as a Village employee, his employment was terminated on August 31, 2016 by Defendant Bjorvik who was acting at the direction B. Smith and/or H. Smith.

16. Defendant Bjorvik was a Trustee for the Village until June 2016 when she became the interim President of the Village.

17. Prior to Defendant Bjorvik's presidency, Marilynn May ("May") served as the President of the Village from May 2004 until June 2016.

**Conflict of Interest Disclosure**

18. In 2003, the Plaintiff was contacted by Mario Gullo ("Gullo"), a developer who was interested in purchasing a bar located in the Village and building a new condominium complex in its place.

19. The Plaintiff encouraged Gullo to move forward with his plan and to apply with the Village's Zoning Board of Appeals for approval.

20. Gullo contacted the Plaintiff the day after his hearing in front of the Zoning Board of Appeals. Gullo informed the Plaintiff that he was quite surprised to learn that H. Smith was the attorney representing the Zoning Board of Appeals because H. Smith was the attorney representing the seller with whom Gullo had entered into a purchase agreement – a purchase agreement contingent upon approval from the Zoning Board of Appeals.

21. The Plaintiff emailed the Village Board, B. Smith, and H. Smith and requested H. Smith disclose whether or not he was representing the seller of the bar with whom Gullo entered

4

into a contract. H. Smith never answered his question; however, B. Smith later confronted the Plaintiff and accused him of harassing his father (H. Smith).

**Disclosure of Waste of Funds Available to the Village**

22. In or about 2007, while the Plaintiff was a Village Trustee in charge of Finance, he worked on a deal to bring a new television service provider (AT&T) to the Village to compete with the existing television provider.

23. As part of the agreement between the Village and AT&T, the Village would receive six percent (6%) of each Village resident's subscription to AT&T.

24. Additionally, part of the Village's agreement with AT&T provided $15,000 for attorney's fees to the Village, estimating it would take the Village's counsel, B. Smith, 60 hours of work (at $250.00 an hour) to complete the agreement between the Village and AT&T.

25. B. Smith was tasked with completing the contract with AT&T to secure the stream of revenue to the Village.

26. B. Smith never effectuated the contract with AT&T, which resulted in the Village missing out on tens of thousands of dollars of revenue from the AT&T contract from 2007 through 2011.

27. In February of 2011, the Plaintiff discovered that the contract had not been finalized, and informed Village President May of the same.

28. May asked the Plaintiff to lead an effort to finalize the agreement with AT&T. After the Plaintiff finalized the agreement with AT&T in 2011, he discovered the Village missed out on approximately $30,000 in revenue in 2010 alone.

29. The Plaintiff communicated to May and the other Trustees that by failing to effectuate the agreement sooner, B. Smith had potentially cost the Village tens of thousands of dollars.

**Plaintiff's Disclosure of Village Zoning Board Misconduct**

30. In or about 2011, the Plaintiff noticed that the commercial building owned by H. Smith and/or B. Smith had a new ground floor tenant, namely an Allstate Insurance agency.

31. In addition to being a commercial tenant, the Allstate Insurance agency had installed two illuminated signs which attached to the building.

32. The Allstate Insurance agency had not applied for nor received the proper business license prior to operating its business out of the building owned by H. Smith and/or B. Smith.

33. In addition, the signs affixed to the building were placed there without the sign permits and electrical permits required by Village code.

34. When the Plaintiff questioned the manager of the Allstate Insurance branch as to how Allstate Insurance was able to open without the necessary permits, the manager informed the Plaintiff that Allstate indicated to its landlord (H. Smith and B. Smith) that if it could not move in by April 1, Allstate Insurance would rent elsewhere.

35. On or about July 26, 2011, the Plaintiff attended a Zoning Board of Appeals hearing where an applicant was seeking to obtain a permit. H. Smith ran the meeting on July 26, 2011.

36. At this meeting, the Plaintiff openly questioned H. Smith as to how Allstate Insurance came to become a commercial tenant in H. Smith's commercial building without the necessary permits.

37. The Plaintiff publicly questioned B. Smith's and H. Smith's conduct in ignoring the Village Code for monetary gain.

38. By so doing, the Plaintiff publicly disclosed that the Village's counsel was ignoring and/or otherwise neglecting to follow the Village rules and that the Village, despite its knowledge

6

of the same, was failing to prevent such neglect and allowed violations of the same policies and procedures it required other tenants to abide by.

**Unfair Benefits to Impact Auto Body**

39. In or around February 2015, the Plaintiff was approached by a Special Agent of the Federal Bureau of Investigation ("FBI") and asked to meet and discuss issues related to the Village.

40. The Plaintiff agreed to meet with the FBI Special Agent and answered a series of questions concerning the Village. During the meeting, the Plaintiff was asked to identify individuals in photographs, which included two photographs of Village employees, and was asked to wear a recording device to help gather evidence. The Plaintiff declined the FBI's request that he wear a recording device.

41. After meeting with the Special Agent, the Plaintiff disclosed the meeting to Defendant Bjorvik, who, upon information and belief, disclosed the same to H. Smith and B. Smith. The Plaintiff did not disclose to Defendant Bjorvik any details pertaining to the photographs so as not to impede any ongoing investigation of the persons included in the photographs.

42. Shortly after his meeting with the FBI Special Agent, in or around spring of 2015, Impact Auto Body ("Impact"), a mechanic repair shop owned and operated in the Village, began parking damaged customer vehicles and vehicles marked as "For Sale" on public property in violation of Village ordinances.

43. Impact was owned and operated by an individual named Daniel Kuzmicki.

44. Impact continued to increase its activities in violation of Village ordinance(s). Impact began parking cars on the sidewalks of the Village near the business, and was actively trying to sell used cars despite not having the proper license to do so.

7

45. At a staff meeting attended by the Plaintiff, then-President May challenged the Village Police Chief Rodger Loni ("Chief Loni") to explain why no tickets were being issued to Impact despite its brazen disregard for the Village's laws. In response, Chief Loni raised his phone in the air and declared the issue was "taken care of", and further stated that he sent part-time Village Officer Richard Cassamassimo to Impact to address the violations.

46. Shortly thereafter, upon learning that Officer Cassamassimo had not issued any tickets to Impact, the Plaintiff was informed by Officer Cassamassimo that he was instructed by Chief Loni to pay a visit to Impact, but was instructed to not write any tickets for the violations.

47. In or about May 2015, the Plaintiff, acting as the Planning and Zoning Administrator, began to consider a non-renewal of Impact's business license as a result of its myriad of zoning code violations. In furtherance thereof, the Plaintiff phoned Mr. Kuzmicki and informed him that he would need to attend a meeting to discuss the potential of Impact's business license not being renewed.

48. Shortly after making the call to Mr. Kuzmicki, the Plaintiff was visited by Village Detective Damian Villagomez who informed the Plaintiff that Mr. Kuzmicki was a "good guy" and that the Plaintiff should not cause any trouble for Mr. Kuzmicki. Detective Villagomez asked the Plaintiff to accompany him to meet with Mr. Kuzmicki at his body shop to discuss the issues, but the Plaintiff insisted that any meeting take place at Village Hall.

49. Detective Villagomez called the Plaintiff a few days later and asked when he was going to meet with Mr. Kuzmicki, and again offered to accompany the Plaintiff to the commercial space occupied by Impact to introduce the two men. The Plaintiff again insisted that the

8

meeting take place at Village Hall, and that there was no need for Detective Villagomez to be in attendance.

50. A few days later, in late May 2015, the Plaintiff received a call from an administrator at Village Hall who indicated that Mr. Kuzmicki wanted to meet the Plaintiff at Village Hall to discuss his business license.

51. Thereafter, Mr. Kuzmicki came to Village Hall and met with the Plaintiff. The Plaintiff asked a Village employee, Jeanne Walsh, to also attend the meeting.

52. During the meeting, the Plaintiff learned that Mr. Kuzmicki had never received a single ticket from the Village. Mr. Kuzmicki explained that the Village police department must "like" him. Mr. Kuzmicki stated that he "takes care of the police." Mr. Kuzmicki further offered the Plaintiff a $500.00 gift card to a local restaurant.

53. The Plaintiff refused the gift card, informed Mr. Kuzmicki that he should expect his license renewal application to be denied, and exited the meeting.

54. The Plaintiff informed then-President May, then-Trustee Defendant Bjorvik, and the Village Comptroller, Frank Calistro Jr., of the offer from Mr. Kuzmicki and the circumstances surrounding the same. In response, May called Chief Loni and demanded that all illegally parked cars at Impact be removed immediately.

55. The cars illegally parked at Impact were removed within a few days; however, the Plaintiff learned that the cars were simply moved to Compass Self Storage, a nearby storage facility.

56. The Plaintiff approached the manager of Compass Self-Storage and asked why the vehicles were parked there. The manager informed the Plaintiff that a River Grove police officer visited the business a few days prior and requested that Compass Self Storage allow one of the officer's friends to park some cars in its lot.

9

57. When the manager of Compass Self Storage informed the officer that he was prohibited from parking vehicles on site, the Village police officer provided Compass Self Storage with his business card, and informed him that he would take care of any issues with the Village. The business card was that of Detective Villagomez.

58. The manager of Compass Self Storage told the Plaintiff he felt intimidated through the experience, and had no choice other than to allow for the cars to be parked on Compass Self Storage's property.

59. The Plaintiff went immediately to Village Hall and disclosed the events that transpired to President May. May called Chief Loni into her office along with the Plaintiff. At the direction of May, the Plaintiff reiterated the sequence of events to Chief Loni, and further reminded Chief Loni that his previous instruction to Cassamassimo was to not write any tickets to Impact. Chief Loni stood up and abruptly left the office when the Plaintiff relayed the events from Compass Self Storage.

60. On information and belief, Chief Loni was concerned that the Plaintiff may be wearing a listening device at the behest of the FBI.

61. The Plaintiff disclosed the events surrounding Impact, the Village police department's refusal to enforce the law, the meeting with Mr. Kuzmicki, the subsequent repositioning of the vehicles to Compass Self Storage through Village police officer's request, and the conversation with Chief Loni to the FBI.

**Additional Disclosure of Waste of Funds Available to the Village**

62. In or around 2004, the Village began acquiring property in its downtown district and in other areas to expand its development.

63. In total, the Village purchased approximately six parcels of land throughout the business district.

64. The Village Attorneys, H. Smith and/or B. Smith, represented the Village at the closing for each parcel of land the Village purchased.

65. Following the purchase of the properties, no property tax exemption was applied for by either Village Attorney H. Smith or by Village Attorney B. Smith.

66. The Village continued paying and/or accruing property tax debt on the parcels of land unnecessarily until the Plaintiff discovered the error in or around 2013.

67. The Plaintiff obtained the tax-exempt status on the parcels of land owned by the Village, and had the then-current unpaid tax bill forgiven.

68. In total, the failure to apply for property tax exempt status on the various parcels of land owned by the Village cost the Village tens of thousands of dollars.

69. The Plaintiff disclosed the failure of H. Smith and B. Smith to apply for tax exempt status to the Village Board.

**Disclosure of Violations of State Statutes**

70. In or about June 2016, while at a Financial Strategy Group meeting, the Plaintiff became aware of a report from the Illinois Department of Insurance regarding the Police Pension Fund. The Police Pension Fund is the largest financial liability of the Village.

71. The report concluded, among numerous violations of state statute, that the pension being currently paid to former Chief Loni was in violation of state statute. Specifically, the report noted that Chief Loni retired in October 2006 and began collecting a sizeable pension; however, the very next day after his retirement, Chief Loni was hired as the "Director of Police", and began collecting a salary from the Village in addition to his pension.

72. The report cited to an ordinance that B. Smith authored, which created the position of Director of Police, as evidence that the circumstances surrounding Chief Loni's retirement were a conflict of state statutes.

73. To formulate the proper course of action, the Plaintiff publicly addressed these issues.

**Disclosure of Improper Tax Exemption Application**

74. In or around the spring of 2016, the Plaintiff learned that H. Smith applied for tax exemption status on various parcels of land on the basis that the parcels were being used for municipal purposes.

75. In fact, the parcels of land were being used for commercial purposes.

76. Specifically, the parcels of land had been leased from the Village to commercial developers sometime in the 1980's. The agreement, as drafted by H. Smith, leased the Village-owned land to the commercial developers for ninety-nine (99) years at a rate of ten dollars ($10) a year, an arrangement which was grossly under the fair market value for the parcels.

77. The agreement as drafted by H. Smith required the tenants to pay all property taxes; however, six months after the lease began, H. Smith applied for tax exemption based on a representation the land was being used for municipal purposes.

78. Just months before the Village terminated his employment, the Plaintiff disclosed the existence of the lease, and H. Smith's application for tax exemption on the commercial parcels, publicly.

**Illegal Termination of Plaintiff's Employment**

79. In the middle of June 2016, May resigned from her office of President of the Village due to personal reasons.

80. Shortly thereafter, a meeting was held at B. Smith's law office with the Village Trustees where B. Smith advised the Village Board to select then-Trustee Defendant Bjorvik to fill the position vacated by May.

81. The Village Board voted to elect Defendant Bjorvik to serve as acting Village President.

82. Later in June 2016, Defendant Bjorvik emailed the Plaintiff to ask for a comprehensive report of his projects, his point of contact for those projects, and other details. The Plaintiff provided the details Defendant Bjorvik demanded of him.

83. The Plaintiff was the only employee required to submit such a report.

84. When the Plaintiff asked Defendant Bjorvik why he was the only Village employee needing to submit such a report, Defendant Bjorvik responded that she had lost a great deal of trust in him in the recent weeks.

85. Defendant Bjorvik further disclosed to the Plaintiff that B. Smith had drafted the document she sent the Plaintiff seeking his detailed report.

86. Defendant Bjorvik informed the Plaintiff that her loss of trust in Plaintiff stemmed from the contents of an e-mail the Plaintiff sent to the Mayor of Rosemont, Bradley Stephens ("Stephens").

87. Defendant Bjorvik advised the Plaintiff that she was informed the Plaintiff made disparaging remarks about both Defendant Bjorvik and her husband to Stephens in the email.

88. Defendant Bjorvik further admitted to having never actually seen the email sent from the Plaintiff to Stephens, and when the Plaintiff offered Defendant Bjorvik an opportunity to review the email a few days later, Defendant Bjorvik declined the Plaintiff's offer.

89. Shortly thereafter, in early July 2016 while attending a Fourth of July celebration, the Plaintiff had a discussion with an individual named David Guerin ("Guerin"), wherein the Plaintiff discussed the misconduct on the part of H. Smith and B. Smith.

90. Guerin was rumored to be interested in running for Village President the following election, which was set to take place in April 2017.

91. Guerin, who was friends with both H. Smith and B. Smith, defended them during his conversation with the Plaintiff.

92. On July 7, 2016, the Board presented the proposed budget for 2016 and 2017, which included the full year's salary for the Plaintiff's position, Economic Development Director. The budget was on display for the public to examine prior to a July 21, 2016 public hearing.

93. On or about July 16, 2016, the Plaintiff had another conversation with Guerin concerning the status of the political scene in the Village. The Plaintiff apologized for discussing politics at a celebratory event in the weeks prior. During this conversation, Guerin reminded the Plaintiff that if the Smiths truly wanted to get rid of him, they simply would remove his salary from the annual budget.[1]

94. On or about July 20, 2016, immediately prior to the July 21, 2016 public hearing, the Plaintiff met with Defendant Bjorvik. During this meeting, Defendant Bjorvik informed the Plaintiff that his job would possibly be eliminated due to budget concerns, despite the fact the previously posted proposed budget included the Plaintiff's salary.

95. The Plaintiff reminded Village President Defendant Bjorvik that because he receives no health insurance, and that a majority of his salary is derived from the Tax Increment

---

[1] Guerin successfully ran for office in the April 2017 election and is currently the Village President of River Grove.

14

Financing Fund, eliminating his position would have a minimal effect on the Village's general fund.

96. Despite this, at the direction of Village President Defendant Bjorovik, the proposed budget was amended to remove the Plaintiff's salary from the 2016-2017 budget, thereby terminating his employment.

97. No other positions were eliminated at this time, aside from the Plaintiff's.

98. Village President Defendant Bjorvik's decision to illegally terminate the Plaintiff's employment was the result of the influence and insistence of B. Smith and/or H. Smith, and was the direct result of the Plaintiff's public disclosure of corruption and self-dealing within the Village.

99. The decision to terminate the Plaintiff's position with the Village was the result of the Plaintiff's actions in disseminating the misconduct by B. Smith, H. Smith, and other Village employees, and his willingness to cooperate with the FBI's investigation.

100. The decision to terminate the Plaintiff's position with the Village was the result of the Plaintiff's exercise of his Constitutional right to freedom of speech.

## COUNT I

**42 U.S.C. §1983 - Violation of Plaintiff's First Amendment Rights against the Defendants**

101. The Plaintiff restates and re-incorporates by reference Paragraphs 1-100 as though set forth in full herein.

102. The First Amendment to the United States Constitution guarantees the Plaintiff's right to speak out on matters of public concern without fear of unjust retaliation.

103. As described more fully above, the Plaintiff engaged in extensive protected speech on matters of public concern by challenging, questioning, and exposing the actions or inactions of the Village.

104. The Village had a widespread policy of ignoring actions or inactions which constituted violations of law, improper conduct, and which harmed its taxpayers.

105. The Village had a widespread policy of deferring its decisions to B. Smith and/or H. Smith, even in situations in which the advice given by B. Smith and/or H. Smith was knowingly unlawful or not in the best interests of the Village's taxpayers.

106. As a matter of both policy and practice, the Village facilitated the very type of misconduct the Plaintiff disclosed by allowing it to continue as a matter of practice within the Village.

107. As a result of the Plaintiff's exercise of protected speech, the Defendants retaliated against the Plaintiff by refusing to remedy unlawful and incorrect action or inaction which was exposed by the Plaintiff, and by ultimately terminating his employment with the Village.

108. At all times relevant to the instant action, Village President Defendant Bjorvik, B. Smith, H. Smith, and the Village Board acted as employees, supervisors, advisors, agents, and final policymakers of the Village.

109. Retaliation against the Plaintiff was devised, approved, and carried out by Defendant Bjorvik, an individual with significant policymaking authority and influence.

110. By authority delegated to her by the Village, Defendant Bjorvik was responsible for the general management and control of the Village.

111. By authority delegated to them by the Village, attorneys B. Smith and H. Smith served, and continue to serve, as the main advisors, attorneys, and policymakers of the Village.

112. By authority delegated to them by the Village, the Village Board serves as the legislative branch of the Village and performs such acts and duties as required by state law.

113. Due to the Plaintiff's prior public disclosures regarding the Village's action or inaction, the Defendants refused to take appropriate action and instead improperly terminated the Plaintiff's employment at the request and advice of B. Smith and/or H. Smith.

114. The misconduct of Defendant Bjorvik was the result of the Village's deliberate indifference to policies and law, and such indifferences reflect the widespread practices of the Village.

115. The Plaintiff exercised his rights to free speech by exposing and publicly disclosing the unlawful activity by employees and agents of the Village.

116. Defendant Bjorvik, the Village, and the Village's employees acted under the color of law at all times relevant hereto when they retaliated against the Plaintiff and deprived the Plaintiff of his constitutional rights pursuant to the Village's widespread custom of submitting to B. Smith and H. Smith's advice, desires, and intentions to engage, or fail to engage, in acts which are unlawful and which are against the best interests of the Village's taxpayers.

117. Defendant Bjorvik, at all times relevant hereto, acted pursuant to her official capacities.

118. Defendant Bjorvik's actions in terminating the Plaintiff's position was a result of the Village's longstanding policy/custom of blindly following the wishes and desires of B. Smith and/or H. Smith and ignoring incidents of corruption and/or self-dealing.

119. The Defendants' acts were related to the performance of each individuals' job duties at all times relevant hereto.

120. B. Smith's and/or H. Smith's advice, actions, or inactions within the Village were fueled by their underlying personal vendetta against the Plaintiff for his exposure of improper Village activity or policy.

121. The Plaintiff acted as a private citizen and as a public employee desirous to help the public, and the Plaintiff's actions in exercising his freedom of speech rights was a motivating factor in the Village's termination of the Plaintiff's employment.

122. By way of the Defendants' actions, the Plaintiff has suffered compensable injury and harm as result of being denied his rights protected under the First Amendment of the United States Constitution.

123. The conduct of the Defendants violated Plaintiff's right to free speech and free association to participate in local government as provided by the First Amendment of the Constitution.

124. The Defendants intentionally retaliated against the Plaintiff with malice or reckless indifference to Plaintiff's civil rights.

125. The actions of the Defendants have caused Plaintiff great mental anguish, humiliation, and degradation, physical and emotional pain and suffering, inconvenience, future pecuniary losses, and other consequential damages.

126. The actions of the Defendants were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights secured by 42 U.S.C. §1983.

127. As a result of the aforementioned deprivation of federal rights, the Plaintiff suffered and will likely continue to suffer injuries, including but not limited to emotional distress.

**WHEREFORE**, Plaintiff, Raymond Bernero, respectfully requests that judgment be entered against the Defendants; that he be awarded compensatory damages in an amount to be determined at trial; an award of reasonable attorney's fees, costs, and litigation expenses; and any other relief as the Court may deem just or equitable.

## COUNT II

### Violation of Illinois Whistleblower Act – Against the Defendants

128. The Plaintiff restates and re-incorporates by reference Paragraphs 1-100 as though set forth in full herein.

129. The actions taken by the Defendants in violation of the Illinois Whistleblower Act have caused the Plaintiff to suffer compensable injury and harm.

130. The Village was at all times complained of the Plaintiff's employer as defined in 740 ILCS § 174/5.

131. Defendant Bjorvik was at all times an employee of the Village acting within the scope of her authority in dealing with the Village's employees.

132. The Plaintiff was at all times complained of an employee of the Village as defined in 740 ILCS § 174/5.

133. The Defendants were prohibited according to the Illinois Whistleblower Act from retaliating against the Plaintiff for his disclosure of improper and unlawful action or inaction by the Village.

134. The Defendants intentionally retaliated against the Plaintiff due to his actions in disclosing public corruption and wrongdoing on the part of the Village's agents and employees.

135. As a result of the Defendants' actions, the Plaintiff has suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages and benefits, future pecuniary losses, and other damages.

136. The actions of the Village through its agents and employees was intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff, Raymond Bernero, respectfully requests that judgment be entered against the Defendants Village and Bjorvik; that he be awarded compensatory damages in an amount to be determined at trial; an award of reasonable attorney's fees, costs, and litigation expenses; and any other relief as the Court may deem just or equitable.

Respectfully Submitted,
Raymond Bernero

By: */s/ Anish Parikh*_____
Attorney for the Plaintiff

PARIKH LAW GROUP, LLC
Attorneys for Plaintiff
Anish Parikh, 6298612
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
Tel: (312) 725-3476